## EXHIBIT INDEX

Exhibit A
Book Cover and Selected Excerpt from America's Great Parking Scam: You've Been Robbed?!? (Introduction and Context)
(In deference to this Court's decorum, the book cover has been reformatted. To view the original published cover, see www.ParkScam.com.)

Photographic Evidence (All pictures taken from 11/29/2025 thru 02/20/2026 and to Plaintiff's knowledge signs are still in place

Exhibit B-1 through B-10
Photographs of Non-Compliant Parking Signage and Enforcement Conditions — Town of Palm Beach, Florida

Exhibit C-1 through C-4
Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Boca Raton, Florida

Exhibit D-1 through D-2
Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Riviera Beach, Florida

Exhibit E-1 through E-2
Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Delray Beach, Florida

Exhibit F-1 through F-5
Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Fort Lauderdale, Florida

Exhibit G-1 through I-3
Photographs of Parking Conditions Adjacent to the Paul G. Rogers Federal Courthouse — West Palm Beach, Florida

Exhibit H-1 through J-2
Representative Parking Application and Kiosk Screens Demonstrating Compelled License Plate Entry, Electronic Payment, and Absence of Age or Parental Consent Inquiry

Exhibit I
Redacted Sample Municipal Parking Citation Issued Under the Challenged Enforcement Architecture

13

Exhibit J
Email Correspondence from MunicipalCitations.com Confirming Dismissal of a Parking Citation

Exhibit K
Supplemental Memorandum of Law Regarding MUTCD Regulatory Signage and Parking Enforcement

Exhibit L
Excerpts from the Manual on Uniform Traffic Control Devices (MUTCD)

Exhibit M
Complaint Submitted to the Florida Attorney General

Exhibit N
Complaint Submitted to the Federal Trade Commission

Exhibit O
Complaint Submitted to the U.S. Securities and Exchange Commission

Exhibit P
Letter to the U.S. Secretary of Transportation, Sean Duffy, Regarding MUTCD Compliance Adjacent to Federal Courthouses

Exhibit Q
Excerpts from ParkMobile's Privacy Policy

Exhibit R
Excerpts from ParkMobile's Terms of Service (TOS)

# Exhibit A

## Exhibit A — Book Cover and Selected Excerpt



**NOTICE TO THE COURT:** The attached image is a modified version of the Plaintiff's book cover, adapted for filing out of respect for the decorum and dignity of this Court. The original, unmodified version—which forms part of the factual record of the 'Great Parking Scam' and illustrates the non-compliant signage at issue—can be viewed for context at www.ParkScam.com.

16

**(excerpt)**

My name is Kerry Lutz. By training, I am a recovering attorney. By temperament, I am a systems analyst and algorithm decoder. For more than fifteen years as an author and podcaster, my work has focused on how complex systems actually function—not as they are described, but as they operate in practice. Where systems remain aligned with their stated purpose, they work. Where they drift, they fail —predictably, repeatedly, and at public expense.

I have spent my career studying legal, financial, and civic systems to understand where structure turns into dysfunction. Systems do not fail randomly. Confusion is not an accident. When rules become opaque, signals conflict, and enforcement accelerates faster than notice, the system has already departed from its legitimate role.

I am suspicious of all extractive structures—systems that take from the public without providing corresponding value. I abhor corruption, but more importantly, I reject institutional gaslighting: the insistence that confusion is compliance, that coercion is choice, and that revenue collection is regulation. Those principles led me to closely examine what I now call the *Parking Industrial Complex.*

Parking regulation did not begin as a punishment regime. The first meters were introduced to fund safe, affordable off-street parking and to promote parking space turnover. Over time, municipalities discovered a different use: automated, low-resistance revenue extraction. That deviation hardened into policy. Policy hardened into dependency. And dependency hardened into a nationwide structure that increasingly bears little resemblance to legitimate regulation and proper intent.

Today, drivers face conflicting signage, hidden terms, digital payment traps, aggressive penalties, and procedural shortcuts that undermine basic principles of notice, due

17

process and fairness. Instead of clarity, there is confusion. Instead of fair warning, there is assumption. Instead of regulation, there is extraction. These are not isolated failures; they are intended systemic features.

This book analyzes and explains this disturbing trend—how it occurred, how it persists, and how it can be corrected. It is neither an attack on government, nor on the individuals who work within it. It is an argument that regulation exists to serve the public, not to entrap it. When that relationship reverses, correction is not optional; it is necessary.

Some will argue that reform carries financial consequences for municipalities that rely on this revenue. Those consequences are neither accidental nor unjust. A government that funds operations through noncompliant signage, punitive enforcement, and procedural ambiguity has already abandoned sound practice. Restoring alignment is not punishment; it is accountability.

Parking is not a trivial issue. It is simply the most visible one. Millions encounter it daily—often within steps of courthouses, city halls, and civic institutions meant to embody fairness and due process. What we learn by correcting this system applies far beyond parking itself.I undertake this work with respect for the rule of law, for due process, and for the belief that properly aligned systems strengthen public trust. The question is not whether reform is possible. It is whether we still have the discipline and integrity to insist upon it.

## Chapter 1 — **Revelation:** We've Been Robbed!

I had been parking there for twelve years without incident. The same curb, the same routine, the same understanding shared by locals and businesses alike. Then one day,

without warning, there was a ticket on my windshield compliments of Riviera Beach. I observed no meters, no kiosks, no apps, and no informational signs to announce a regime change.

20

# Exhibit B

## Exhibit B-1 through B-10

Photographs of Non-Compliant Parking Signage and Enforcement Conditions — Town of Palm Beach, Florida

*(All photographs taken in the Town of Palm Beach, Florida, home of the current president. Images show full sign assemblies including post, height, placement, and surrounding context.)*





**Observed condition:** A blue ParkMobile payment sign mounted pretending to be an R7 Traffic Control Device

**Violations:** APP-AS-TCD, IMPROPER HIERARCHY, NON-TCD, NON-STD COLOR, LOGOS/ADS, NOREFLECT

**Observed condition:** A blue ParkMobile payment sign mounted pretending to be an R7 Traffic Control Device **Issues:**

**Violations:** Same as adjacent sign adjacent.

Town of Palm Beach



**Observed condition:** A sign with arrows pointing downward to the ground, non-MUTCD standard**:**

**Violations: APP-AS-TCD, IMPROPER HIERARCHY, NON-TCD, NON-STD COLOR, LOGOS/ADS, APP-DEPENDENT**

**Observed condition:** A Green and white Resident Parking Permit sign complete with PB City Logo**:**

**Violations:** INVALID PERMIT, NON-TCD, LOGOS/ADS, IMPROPER COMBO, NON-STD COLOR

22

Town of Palm Beach

 

**Observed condition:** App sign with arrows pointing to a yellow non-parking curb non-MUTCD standard:

**Violations:** APP-AS-TCD, IMPROPER HIERARCHY, NON-TCD, NON-STD COLOR, LOGOS/ADS, APP-DEPENDENT

**Observed condition:** A no parking, commercial loading zone with no arrows next to an App sign:

**Violations:** APP-AS-TCD, IMPROPER HIERARCHY, NON-TCD, NON-STD COLOR, LOGOS/ADS, IMPROPER COMBO, APP-DEPENDENT

Town of Palm Beach





**Observed condition:** A valid TCD 30-minute parking sign displayed next to an App sign with logos and trademarks along with advertising.

**Violations**: IMPROPER HIERARCHY, APP-AS-TCD, NON-TCD, LOGOS/ADS, IMPROPER COMBO

**Observed condition:** A no permit only sign written in blue. Two additional smaller signs compact cars only and no backing into spaces.

**Violations**: **NON-TCD, NON-STD COLOR,** FALSEREG, NOAUTH MISLEAD

24

Town of Palm Beach

 

**Observed condition:** Hybrid parking assembly combining a red regulatory sign with a blue, app-based payment sign on the same post. The app/payment panel visually dominates, uses non-standard regulatory coloring. **Not recognized by the MUTCD** (Worst sign observed)

**Violations:** APP-AS-TCD, IMPROPER HIERARCHY, NON-TCD, NON-STD COLOR, LOGOS/ADS, IMPROPER COMBO, APP-DEPENDENT

**Observed condition: Mirror image of opposite sign. Posted to show sign is in regular use by Town of Palm Beach**

**Violations:** APP-AS-TCD, IMPROPER HIERARCHY, NON-TCD, NON-STD COLOR, LOGOS/ADS, IMPROPER COMBO, APP-DEPENDENT

# Exhibit C

## Exhibit C-1 through C-4

Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Boca Raton, Florida





**Observed condition:** Stacked parking signs mounted near a storefront, combining metered parking instructions with a time-limit sign, parallel to street and not observable to oncoming traffic, creating ambiguous and cluttered parking control.

**Violations:** NON-TCD, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED, IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD FORMAT

**Observed condition:** Stacked, non-standard parking signs mounted low and oriented parallel to the roadway near a commercial building, mixing parking instructions, arrows, and commercial branding, with visibility degraded at night and no clear MUTCD-compliant parking control device.

Violations: NON-TCD, LOGOS/ADS, IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD FORMAT, NON-REFLECTIVE, IMPROPER HEIGHT, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED

City of Boca Raton:

 

**Observed condition:** App-based parking meter sign mounted parallel to the street, presenting itself as a traffic control device despite being app-directed, with commercial branding and non-standard colors, oriented so approaching drivers receive inadequate notice

Violations: APP-AS-TCD, NON-TCD, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED, LOGOS/ADS, NON-STD COLOR, IMPROPER COMBO, APP-DEPENDENT

**Observed condition:** Stacked parking signs mounted on a single post, combining metered parking instructions with app-based payment messaging and a time-limit sign, partially angled toward the roadway, resulting in reduced legibility for approaching drivers and unclear curbside notice.

Violations: APP-AS-TCD, NON-TCD, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED, IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD FORMAT, APP-DEPENDENT

28

City of Boca Raton:

 

**Observed condition:** App-based parking meter sign mounted parallel to the street, presenting itself as a traffic control device despite being app-directed, with commercial branding and non-standard colors, oriented so approaching drivers receive inadequate notice

Violations: APP-AS-TCD, NON-TCD, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED, LOGOS/ADS, NON-STD COLOR, IMPROPER COMBO, APP-DEPENDENT

**Observed condition:** Stacked parking signs mounted on a single post, combining metered parking instructions with app-based payment messaging and a time-limit sign, partially angled toward the roadway, resulting in reduced legibility for approaching drivers and unclear curbside notice.

Violations: APP-AS-TCD, NON-TCD, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED, IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD FORMAT, APP-DEPENDENT

# Exhibit D

## Exhibit D-1 through D-2

Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Riviera Beach, Florida

City of Riviera Beach (Singer Island) where it all started:

 

**Observed condition:** Low-mounted, pastel-colored sign stack in a park setting advertising private parking privileges, combined with a beach/walking promo sign, using logos and non-reflective materials, with no posted times or days of enforcement. Green sign above also non-compliant.

Violations: NON-TCD · LOGOS/ADS · NON-STD COLOR · NON-REFLECTIVE · IMPROPER HEIGHT · IMPROPER COMBO · MISSING TIMES/DAYS

**Observed condition:** Low-mounted, pastel-colored parking sign placed directly in front of vehicle spaces, advertising private retail parking and app-based payment, positioned below typical sightlines and easily obscured by SUVs or trucks.

Violations NON-TCD · LOGOS/ADS · NON-STD COLOR · NON-REFLECTIVE · IMPROPER HEIGHT · VISIBILITY OBSTRUCTED · APP-AS-TCD · APP-DEPENDENT:

31

# Exhibit E

## Exhibit E-1 through E-2

Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Delray Beach, Florida

City of Delray Beach:

 

**Observed condition:** Multiple stacked, non-standard signs on a single post near a building entrance, mixing app-directed pickup/drop-off messaging with a non-recognized parking restriction and advisory signage, without a clear MUTCD parking control device.

**Violations:** NON-TCD, IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD COLOR,  NO SUCH SIGNS UNDER MUTCD, **LOW MOUNT**

**Observed condition:** "Christmas tree" sign stack on a single pole combining a blue parking symbol, multi-line time/payment instructions, zone number placard, and separate app-based meter kiosk, creating cluttered, app-dependent parking control without a single clear MUTCD parking sign.

**Violations:** NON-TCD, APP-AS-TCD, IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD FORMAT, APP-DEPENDENT, LOW MOUNT

# Exhibit F

## Exhibit F-1 through F-5

Photographs of Non-Compliant Parking Signage and Enforcement Conditions — City of Fort Lauderdale, Florida





**Observed condition:** App-based parking sign mounted on a pole in front of a retail storefront, using commercial branding, QR-style payment instructions, and non-standard colors, presenting itself as a parking control device without MUTCD-recognized format or clear curbside regulatory notice.

**Violations:** APP-AS-TCD, NON-TCD, LOGOS/ADS, NON-STD COLOR, APP-DEPENDENT

**Observed condition:** Small, app-based parking sign mounted mid-pole near a residential driveway, using non-standard colors and app-directed payment instructions, positioned below typical sightlines and lacking a clear MUTCD-recognized parking control sign governing the curb.

**Violations:** PP-AS-TCD, NON-TCD, NON-STD COLOR, IMPROPER HEIGHT, VISIBILITY OBSTRUCTED, APP-DEPENDENT

City of Fort Lauderdale:





**Observed condition:** Back-to-back sign installation on a single pole combining a standard R7 NO PARKING / Tow-Away sign with a large, print and graphic-heavy "paybyphone" that has a bit of everything using non-standard colors, app store logos Fort Lauderdale Logo, credit card logos and layout, creating conflicting messaging, poor legibility, and unclear curbside regulation. Your eye has no idea where to go.

**Violations:** IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD FORMAT, NON-STD COLOR, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED, APP Dependent, LOGOS/ADS, WRONG FONTS, TYPEFACE TOO SMALL FOR TIME

**Observed condition:** Side by side parking signs on a single pole combining a graphic-heavy parking schedule board with an app-based payment sign, using non-standard colors and formats, oriented inconsistently toward the street, resulting in cluttered, app-dependent parking control without clear MUTCD-recognized regulation.

**Violations:** APP-AS-TCD, NON-TCD, IMPROPER COMBO, IMPROPER HIERARCHY, NON-STD FORMAT, NON-STD COLOR, IMPROPER ORIENTATION, VISIBILITY OBSTRUCTED, APP-DEPENDENT

# Exhibit G

## Exhibit G-1 through G-3

Photographs of Parking Conditions Adjacent to the Paul G. Rogers Federal Courthouse — City West Palm Beach, Florida and nearby areas





**Observed condition:** The following pictures were taken in the vicinity of the Paul G. Rogers Courthouse in Downtown West Palm Beach, which is where my action against the Town of Palm Beach, the Cities of Boca Raton, Riviera Beach, West Palm Beach, Delray Beach and Fort Lauderdale is being filed.

**Observed condition:** No parking signs present near the Rogers Courthouse. Without a Traffic Control Device, no regulation is lawfully conveyed. No notice, due process. Also violation of Americans with Disability Act.

**Violations:** No signage pursuant to **MUTCD §1A.01** – Traffic control devices are required to **convey official traffic regulations. N**o **ADA-compliant signage is present** identifying accessible parking spaces, accessible routes, or the location of ADA parking accommodations.

39

City of West Palm Beach:

 

**Observed condition:** No signs present, only attempted notice is a sticker with zone number and times of enforcement.

**Violations:** NON-TCD · APP-AS-TCD · IMPROPER HIERARCHY · APP-DEPENDENT At a courthouse, the lack of **ADA-compliant parking signage** creates a standalone civil rights violation. ADA 42 U.S.C. § 12132 No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity…

**Observed condition:** No signs present, only attempted notice is a sticker with zone number and times of enforcement. In an area away from courthouse.

**Violations:** NON-TCD · APP-AS-TCD · IMPROPER HIERARCHY · APP-DEPENDENT At a courthouse, the lack of **ADA-compliant parking signage** creates a standalone civil rights violation. ADA 42 U.S.C. § 12132 No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity…

# Exhibit H

## Exhibit H-1 through H-2

Representative Parking Application and Kiosk Screens Demonstrating Compelled License Plate Entry, Electronic Payment, and Absence of Age or Parental Consent Inquiry



# Exhibit I

## Exhibit I — Redacted Citation from City of Riviera Beach



# Exhibit J

## Exhibit J — Communications from third party adjudication portal

 **Municipal Citation Processing**

Hello Kerry Lutz,

This email is an acknowledgement of your request to dispute your charge 860-804-811. This charge has been put on hold pending a review.

In accordance with FL Statute HB271, a Charge issued in Florida may be disputed within 15 days of windshield placement or date mailed. Municipal Citation Processing may withdraw the Charge or respond within 5 business days. Within 10 days of receiving Municipal Citation Processing's response, you may appeal Municipal Citation Processing's response. If the Appeal is approved, the Charge is dismissed. If the Appeal is denied, you must pay the Charge. APPEALS WILL BE DETERMINED BY A NEUTRAL THIRD-PARTY ADJUDICATOR (EFFECTIVE ARBITRATION, INC.). PARTIES SHALL INITIALLY SPLIT THE FEE TO FILE AN APPEAL, WITH THE LOSING PARTY BEARING THE ADJUDICATOR'S COSTS.

---

**Municipal Citation Processing**

Hi Kerry Lutz,

We are in receipt of your dispute for non-compliance notice #860-804-811. We work diligently to provide dispute responses within an acceptable time frame. Because of a delay in our process, we are canceling notice #860-804-811 as a one-time courtesy. We apologize for the inconvenience. No further action is required on your part for this notice.

If you have already paid this notice, please note that we will be refunding your payment and no further action is required.

Thank you,

# Exhibit K

## Exhibit K — SUPPLEMENTAL MEMORANDUM OF LAW Concerning MUTCD and Parking Enforcement

## Requirement of Lawful Traffic Control Devices as a Prerequisite to Parking and Traffic Enforcement

Issue Presented

Whether federal law, the MUTCD, and Florida law require that a traffic or parking regulation be communicated through a lawfully placed and compliant traffic control device as a prerequisite to issuing citations or taking enforcement action.

Short Answer

Yes. Federal law and the MUTCD require that regulatory requirements be communicated through official traffic control devices that are properly placed and maintained in accordance with the MUTCD. Florida law expressly conditions the legality of enforcement on the existence of an "official traffic control device" that is "placed in accordance with law." Absent a lawful, MUTCD-compliant device providing notice, traffic and parking enforcement actions are unauthorized and unenforceable.

Argument

I. MUTCD Requirement of Lawful Traffic Control Devices for Enforcement

The MUTCD defines an "official traffic control device" as a sign, signal, marking, or device placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic.

The MUTCD further provides that regulatory traffic control devices are used to inform road users of traffic laws or regulations and that such devices must be installed only where supported by law and engineering judgment. The MUTCD expressly states that traffic control devices shall be placed only where they fulfill a need, command attention, convey a clear and simple meaning, and provide adequate time for response.

Critically, the MUTCD makes clear that enforcement presupposes the lawful placement of a compliant device: traffic regulations are not self-executing in the absence of proper signing or marking. Where a regulatory requirement is not properly communicated through a compliant device, enforcement is inconsistent with the MUTCD's fundamental principles of uniformity,

clarity, and notice.

II. Federal Regulatory Authority Conditioning Enforcement on MUTCD Compliance

Under 23 C.F.R. § 655.603(a), the MUTCD is the national standard for all traffic control devices installed on streets, highways, and bicycle trails open to public travel. Devices that do not conform to MUTCD requirements are not lawful traffic control devices under federal law.

Because the MUTCD governs the form, placement, and authority of traffic control devices, enforcement actions predicated on noncompliant devices contravene federal regulations designating the MUTCD as the controlling standard.

III. Florida Statutory Requirement of Lawful Placement for Enforcement

Florida law explicitly conditions enforcement on lawful placement. Section 316.074(1), Florida Statutes, provides that "[n]o person shall willfully fail or refuse to comply with any lawful order or direction of any law enforcement officer or to obey any official traffic control device placed in accordance with law."

Florida statutes define "official traffic control devices" as those placed by authority of a public body or official having jurisdiction. See § 316.003(23), Fla. Stat. Section 316.0745 further requires that such devices conform to the state's uniform system of traffic control devices, which is based on the MUTCD.

Read together, these provisions establish a clear condition precedent to enforcement: a motorist may only be cited or penalized for violating a traffic or parking regulation if the regulation is communicated through an official traffic control device that is lawfully placed and MUTCD-compliant.

IV. Application to Parking Enforcement

Parking regulations are a form of traffic regulation and are subject to the same statutory and MUTCD requirements as moving violations. Time limits, payment requirements, zones, restrictions, and penalties must therefore be communicated through lawful, MUTCD-compliant signage or markings.

App-based systems, QR codes, or enforcement schemes that rely on indirect, obscured, or nonconforming notice—rather than clear, lawful traffic control devices—do not satisfy the statutory and MUTCD prerequisites for enforcement and cannot lawfully serve as the basis for citations or penalties.

Conclusion

Federal law, the MUTCD, and Florida statutes require that traffic and parking regulations be

48

communicated through official traffic control devices that are lawfully placed and compliant with MUTCD standards as a prerequisite to enforcement. Absent such lawful notice, traffic and parking citations are unauthorized and unenforceable as a matter of law.

# Exhibit L

## **Exhibit L** Excerpts from the Manual on Uniform Traffic Control Devices (MUTCD)

## Federal Authority, MUTCD Compliance, and Parking Enforcement

### Federal Authority and the MUTCD

The Manual on Uniform Traffic Control Devices (MUTCD) derives its binding legal authority from federal law. Under 23 C.F.R. § 655.603, the MUTCD is adopted as the national standard for all traffic control devices installed on any street, highway, or facility open to public travel. Each state is required to adopt the MUTCD, or a compliant state version, as a condition of receiving federal highway funds. Municipalities are bound through the state's acceptance of those funds, regardless of whether the municipality itself directly receives federal money. Uniformity is not optional. Congress deliberately tied traffic control standards to federal funding to prevent local governments from creating confusing, inconsistent, or revenue-driven enforcement schemes. The MUTCD exists to ensure that traffic rules are recognizable, predictable, and uniformly applied across jurisdictions. When a city departs from those standards, the consequences are legal as well as practical: unenforceable citations, due process violations, and potential exposure to funding and liability risk.

### What Qualifies as a Traffic Control Device

Parking enforcement turns on a single threshold question: is the sign a lawful traffic control device? The MUTCD answers that question clearly, but only when read as a system rather than through isolated quotations.

A traffic control device is defined as a sign, signal, marking, or other device placed by authority of a public body for the purpose of regulating, warning, or guiding traffic. That authority, however, is conditional. A device qualifies as a lawful traffic control device only if it conforms to MUTCD standards governing design, placement, uniformity, and legibility. A sign that does not meet those standards is not a lawful traffic control device, regardless of where it is placed or who erected it. This distinction is critical. Enforcement authority flows from the device itself, not from the pole, curb, or municipal ordinance behind it. When a sign fails MUTCD compliance, enforcement based on that sign constitutes enforcement without valid notice.

### Mandatory Compliance and Uniformity

The MUTCD leaves no discretion on compliance. Traffic control devices must conform to the Manual. In MUTCD terminology, the word "shall" denotes a mandatory requirement, not a guideline or best practice. This requirement applies to all regulatory signs, including parking restrictions, time limits, payment conditions, and enforcement rules.

Uniformity is a core principle of the MUTCD. Devices must meet the needs of all road users and simplify comprehension rather than increase cognitive burden. Parking systems that

assume smartphone ownership, QR-code literacy, app downloads, data plans, or real-time connectivity violate the uniformity requirement by design. A system that only works for a subset of users is not uniform, and a non-uniform system cannot serve as lawful notice.

## Regulatory Parking Signs and the R7 Series

Parking signs are regulatory signs governed by Chapter 2B of the MUTCD, including the R7 series. These signs regulate parking permissions, restrictions, time limits, and conditions of use. As regulatory signs, they must clearly state the rule, stand alone as notice, and use standardized legends, colors, shapes, and formatting.

While payment methods may be supplemented by additional information, the regulatory rule itself must appear on the sign. A sign that defers essential terms to a QR code, mobile application, or website does not provide lawful notice and does not qualify as a compliant regulatory sign. Technology may facilitate payment, but it may not substitute for regulatory disclosure.

## Applicability to Municipal Lots, Garages, and Parking Authorities

The MUTCD applies to any facility open to public travel, including municipal parking lots, garages, and parking structures. What governmental entity claims ownership is irrelevant. Public access is the controlling factor. Parking authorities, whether organized as departments, enterprises, or quasi-independent entities, exercise delegated police power and are fully bound by MUTCD requirements.

A municipality cannot evade federal uniformity requirements by outsourcing enforcement to a parking authority or private vendor. If the public is invited to park and citations are issued, the MUTCD applies. Public parking facilities are not constitutional or regulatory free zones.

## Legal Consequences of Non-Compliance

A non-compliant sign is not a lawful traffic control device. Citations issued based on such signs are legally defective because they rest on invalid notice. This principle applies equally to streets, lots, garages, and authority-operated facilities.

Parking enforcement depends on lawful traffic control devices. Under MUTCD §§ 1A.01, 1A.02, and 1A.13, a sign that does not conform to MUTCD standards is not a valid traffic control device and cannot create an enforceable parking obligation. This conclusion is conservative, well-supported, and consistent with the structure and purpose of the MUTCD.

When enforcement proceeds without lawful devices, the issue is not technical noncompliance. It is enforcement without authority.

# Exhibit M

## Exhibit M — Florida Attorney General Complaint

## COMPLAINT TO THE FLORIDA ATTORNEY GENERAL
Consumer Protection · Unfair & Deceptive Trade Practices · Minors · Privacy

**To:**

Office of the Florida Attorney General
Consumer Protection Division
State of Florida

Dated:

## I. COMPLAINANT

National Association of American Defrauded Parkers (NAADP)
A consumer-advocacy organization representing tens of thousands of motorists affected by unlawful parking enforcement practices, coercive mobile-application systems, and improper data collection throughout the State of Florida.

## II. AUTHORIZED REPRESENTATIVE

Kerry Lutz
Founder & Managing Director, NAADP

Email: khl@kerrylutz.com

This complaint is submitted in a representative capacity and in the public interest.

## III. OVERVIEW AND BASIS OF COMPLAINT

This complaint requests investigation and enforcement action against multiple Florida municipalities and private parking-application companies engaged in a coordinated system of unfair, deceptive, and unlawful parking enforcement practices.

These practices include issuing parking citations based on non-compliant or absent regulatory signage, coercing motorists into private digital contracts as a condition of lawful parking, collecting and monetizing personal and geolocation data without meaningful consent, and unlawfully contracting with minors.

Upon information and belief, these practices are widespread and prevalent throughout the State of Florida and reflect a standardized enforcement and revenue model rather than isolated incidents.

54

## IV. UNLAWFUL PARKING ENFORCEMENT BASED ON NON-COMPLIANT SIGNAGE

Florida has adopted the Manual on Uniform Traffic Control Devices (MUTCD), which mandates that parking restrictions—being regulatory in nature—must be communicated by compliant R-series regulatory signs.

Parking meters and mobile applications are not traffic control devices and cannot lawfully create, modify, or replace parking regulations. Nevertheless, municipalities across Florida issue parking citations and demand payment in areas where no MUTCD-compliant signage exists or where signage is improperly placed, improperly colored, non-reflective, obscured, or otherwise non-compliant.

As a result, motorists are cited for violations of parking restrictions that are not lawfully established or posted.

## V. MUTCD NON-COMPLIANCE AS AN UNFAIR AND DECEPTIVE TRADE PRACTICE

Issuing parking citations and collecting revenue based on non-existent or unlawfully posted parking regulations constitutes an unfair and deceptive act or practice under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA).

Consumers are misled into believing lawful restrictions exist, enforcement relies on constructive notice that the MUTCD does not permit, and the illegality of the underlying restriction is never disclosed. This results in the collection of money under false pretenses.

## VI. COERCED CONTRACTING AND UNLAWFUL CONTRACTING

A. Coerced Contracting of Adults

Motorists are coerced into digital contracts because payment is demanded under threat of citation, fines, towing, or escalation, there is no meaningful non-digital alternative, and no opportunity to review contractual terms at the curb. Contracts entered under such conditions are coercive and not consensual.

B. Unlawful Contracting with Minors

Minors lack legal capacity to enter binding contracts under Florida law. Nevertheless, parking systems require minors to accept terms of service, waive privacy rights, and authorize geolocation tracking without age verification, parental consent, or parental notification. Each such transaction constitutes a void contract and unlawful data transfer.

## VII. PRIVACY AND DATA-SHARING VIOLATIONS

Parking-application vendors collect precise location and personal data and share such data with numerous third parties. These practices are buried in dense digital terms, impossible to review at the point of enforcement, and coerced through threat of citation. The conduct is particularly egregious where minors' data is involved and constitutes an independent violation of Florida's Digital and Data Privacy protections.

## VIII. VIOLATIONS OF FLORIDA'S DIGITAL / DATA PRIVACY BILL OF RIGHTS

Florida has enacted comprehensive digital and data-privacy protections governing the collection, processing, and sharing of personal data, including heightened protections for sensitive data and the personal data of minors.

The parking-enforcement and payment systems described herein violate these protections by conditioning lawful parking on mandatory acceptance of digital terms, coercing "consent" under threat of citation, fines, towing, or escalation, and collecting precise geolocation and personal data without freely given, informed, and revocable consent.

These violations are particularly egregious with respect to minors. Parking-application systems routinely require minors to accept terms of service, authorize continuous geolocation tracking, and permit data sharing with third parties without age verification, parental consent, or parental notice. Such practices constitute unlawful data collection and transfer and are prohibited under Florida law.

Consent obtained through coercion, lack of meaningful alternatives, or inability to review terms at the point of enforcement is legally invalid. Municipal adoption of app-dependent parking enforcement systems therefore results in systematic violations of Florida's Digital and Data Privacy Bill of Rights and exposes both vendors and participating municipalities to enforcement action, civil penalties, and injunctive relief.

## IX. MUNICIPAL PARTICIPATION AND BENEFIT

Municipalities actively participate by adopting app-dependent enforcement regimes, delegating enforcement authority to private vendors, and receiving revenue from app-mediated payments and citations, creating a public-private enforcement system that externalizes legal and privacy risk onto consumers.

## X. STATEWIDE SCOPE

Upon information and belief, substantially similar practices are widespread, prevalent, and systemic throughout the State of Florida, affecting numerous municipalities and consumers daily. Statewide investigation and relief are therefore warranted.

## XI. RELIEF REQUESTED

The National Association of American Defrauded Parkers respectfully requests that the Florida Attorney General open a statewide investigation; examine MUTCD compliance; investigate coerced and void contracting practices; investigate data-collection and sharing practices; require age gating, parental consent, and parental notification; prohibit unlawful app-conditioned enforcement systems; seek injunctive relief, restitution, and civil penalties; and issue public guidance to municipalities.

## XII. SUPPORTING MATERIALS

Federal complaint and exhibits, photographic documentation, parking-application terms of service, and data-sharing disclosures are attached or incorporated by reference.

## CERTIFICATION

I certify that this complaint is submitted in good faith and is supported by documentary evidence and publicly verifiable information.

Submitted this 29th day of January, 2026.

Kerry Lutz
Founder & Managing Director
National Association of American Defrauded Parkers (NAADP)

# Exhibit N

Exhibit N

## Exhibit N — COMPLAINT TO THE FEDERAL TRADE COMMISSION

Section 5 of the Federal Trade Commission Act – Unfair or Deceptive Acts or Practices
Unlawful Monetary Extraction · Non-Compliant Signage · Digital Coercion · Privacy · Minors

## I. COMPLAINANT

National Association of American Defrauded Parkers (NAADP)
A consumer-advocacy organization representing tens of thousands of motorists nationwide affected by unlawful parking enforcement practices, coercive digital payment systems, and improper collection and monetization of personal and geolocation data.

## II. AUTHORIZED REPRESENTATIVE

Kerry Lutz
Founder & Managing Director, NAADP
Email: khl@kerrylutz.com

This complaint is submitted in a representative capacity and in the public interest.

## III. RESPONDENTS

This complaint concerns private parking-application vendors, including but not limited to mobile parking payment, enforcement, citation, booting, and towing platforms, and their municipal partners that jointly deploy app-conditioned parking enforcement systems.

The conduct described herein reflects standardized, industry-wide practices rather than isolated or accidental misconduct.

## IV. EXECUTIVE SUMMARY OF UNLAWFUL CONDUCT

Respondents operate a coordinated public-private system that extracts parking fees, citations, penalties, boot fees, tow charges, and related revenues from consumers without lawful authority, while simultaneously coercing consumers into invasive digital contracts and data-collection regimes.

Municipalities impose parking restrictions that are not lawfully established or posted because required regulatory signage does not comply with the Manual on Uniform Traffic Control Devices (MUTCD), as adopted by the states. Despite the absence of lawful restrictions, Respondents demand payment and impose penalties. Consumers are coerced under threat of enforcement into surrendering personal and precise geolocation data.

These practices constitute unfair and deceptive acts or practices in violation of Section 5(a) of the FTC Act.

59

## V. FACTUAL ALLEGATIONS — NON-COMPLIANT SIGNAGE AND UNLAWFUL EXTRACTION

Parking restrictions are regulatory in nature and must be communicated through MUTCD-compliant regulatory signage. Across jurisdictions, municipalities routinely enforce parking restrictions where signage is absent, improperly placed, improperly colored, non-reflective, obscured, contradictory, or otherwise non-compliant.

Where required regulatory signage is non-compliant, no lawful parking restriction exists. Any downstream extraction of money — including meter fees, app payments, citations, late fees, boot fees, or tow charges — lacks legal authority and constitutes unlawful monetary extraction.

## VI. DECEPTIVE SUBSTITUTION OF APPS AND METERS FOR LAWFUL NOTICE

Respondents falsely convey that parking meters, QR codes, or mobile applications create enforceable parking restrictions or substitute for lawful regulatory signage. Parking meters and mobile applications are not traffic control devices and cannot create, modify, or replace parking regulations. Representing otherwise materially misleads consumers.

## VII. COERCED DIGITAL CONTRACTING AND DARK PATTERNS

Consumers are required to accept non-negotiable digital terms and privacy policies under threat of citation, towing, or escalation. There is no meaningful non-digital alternative and no opportunity to review terms at the point of enforcement. Respondents employ dark-pattern practices by burying material terms, obscuring appeal rights, and misrepresenting lawful obligations.

## VIII. UNLAWFUL DATA COLLECTION AND SHARING

Parking-application vendors collect precise geolocation data and personal identifiers and share such data with third parties for analytics, marketing, and other secondary purposes unrelated to parking enforcement. These practices are inadequately disclosed, unavoidable in practice, and coerced.

## IX. UNLAWFUL DATA PRACTICES INVOLVING MINORS

Minors routinely use parking systems to comply with posted parking requirements. Respondents nevertheless require minors to accept terms of service, collect and process minors' precise geolocation data, and share such data with third parties without age verification, parental consent, or parental notice. Each such transaction constitutes an unfair practice.

## X. SECTION 5 VIOLATIONS — UNFAIR AND DECEPTIVE ACTS OR PRACTICES

Respondents violate Section 5(a) of the FTC Act by misrepresenting that parking restrictions are lawfully established when they are not; demanding payment where no valid restriction exists; coercing consumers into digital contracts; and engaging in unfair data collection practices. The conduct causes substantial consumer injury, is not reasonably avoidable, and is not outweighed by countervailing benefits.

## XI. MUNICIPAL-PRIVATE COORDINATION

Municipalities actively participate by adopting app-dependent enforcement regimes, delegating enforcement authority to private vendors, and sharing in revenues derived from unlawful extraction, amplifying consumer harm while diffusing accountability.

## XII. INDUSTRY-WIDE AND NATIONAL SCOPE

Upon information and belief, substantially similar practices are widespread across the United States. The challenged conduct reflects an industry-standard business model warranting nationwide investigation and relief.

## XIII. RELIEF REQUESTED

The Complainant respectfully requests that the FTC open a formal investigation; prohibit enforcement based on non-compliant signage; prohibit app-conditioned parking enforcement; require lawful signage compliance and meaningful non-digital alternatives; investigate unlawful data practices involving minors; seek injunctive relief, restitution, disgorgement, and civil penalties; and issue industry-wide guidance.

## XIV. CERTIFICATION

I certify that this complaint is submitted in good faith and is supported by documentary evidence and publicly verifiable information.

Submitted this _____ day of _____, 2026.

Kerry Lutz
Founder & Managing Director
National Association of American Defrauded Parkers (NAADP)

61

# Exhibit O

## Exhibit O — COMPLAINT TO THE U.S. SECURITIES AND EXCHANGE COMMISSION

Municipal Securities · Material Misstatements · Disclosure Failures

To:

Office of Municipal Securities
Division of Enforcement
U.S. Securities and Exchange Commission

Date: January 29, 2026

## I. COMPLAINANT

National Association of American Defrauded Parkers (NAADP)
A consumer-advocacy organization representing motorists and stakeholders affected by unlawful parking enforcement practices and related financial misrepresentations nationwide.

Authorized Representative:
Kerry Lutz
Founder & Managing Director, NAADP

Email: khl@kerrylutz.com

## II. OVERVIEW AND BASIS OF COMPLAINT

This complaint requests investigation and enforcement action concerning municipal bonds and related securities whose repayment is directly or indirectly tied to parking-derived revenue, including ticket fines, app-based payments, booting fees, towing fees, and administrative penalties.

Upon information and belief, municipalities across the United States have issued bonds backed by parking revenue streams that are legally defective, materially overstated, or unlawfully collected, without adequate disclosure to investors.

## III. MUTCD NON-COMPLIANCE AS A MATERIAL RISK

Municipal parking enforcement nationwide is governed by the Manual on Uniform Traffic Control Devices (MUTCD), the federally recognized standard adopted by all states.

Parking restrictions are regulatory in nature and must be communicated by compliant signage. Parking meters and mobile applications are not traffic control devices and cannot substitute for legal parking rules. Despite this, citations are routinely issued where required MUTCD-compliant signage is absent or non-compliant.

63

## IV. ILLEGAL PARKING REVENUE STREAMS SUPPORTING MUNICIPAL BONDS

Parking revenue supporting municipal bonds frequently includes ticket revenue based on non-compliant signage, booting revenue imposed without lawful predicates, towing revenue triggered by invalid citations, and app-based payments collected under unlawful enforcement regimes. Such revenue is unstable and subject to mass invalidation.

## V. COERCED AND VOID CONTRACTING AS UNDISCLOSED RISK

Parking revenue is increasingly collected through private mobile applications requiring users to accept terms of service, privacy waivers, and arbitration clauses.

Adults are coerced into these contracts under threat of citation or towing, while minors lack legal capacity to contract. Nevertheless, minors are required to accept these terms without age verification or parental consent, rendering such contracts void and revenue legally contestable.

## VI. PRIVACY, DATA, AND LITIGATION RISK

Parking applications collect and monetize precise location and personal data, share data with numerous third parties, and create significant regulatory and litigation risk. Any disruption to app-based enforcement directly impairs revenue streams backing municipal bonds.

## VII. FAILURE OF MATERIAL DISCLOSURE

Municipal bond offering documents generally fail to disclose dependence on compliant signage, risk of mass citation invalidation, exposure from coerced and void contracts, minors' data risks, and regulatory enforcement exposure. These omissions are material to investors.

## VIII. NATIONAL SCOPE

Upon information and belief, these practices are widespread and prevalent nationwide, affecting municipal issuers, underwriters, rating agencies, and investors.

## IX. REQUESTED ACTION

NAADP respectfully requests that the SEC investigate municipal bond disclosures tied to parking-derived revenue, assess material misstatements and omissions, examine the legality of underlying revenue streams, require corrective disclosures, evaluate underwriter and issuer due diligence failures, and take enforcement action where appropriate.

## X. SUPPORTING MATERIALS

Federal complaint and exhibits, state AG complaint, photographic documentation, parking-app terms of service, and data-sharing disclosures are attached or incorporated by reference.

## CERTIFICATION

I certify that this complaint is submitted in good faith and is supported by documentary evidence and publicly verifiable information.

Submitted this ___ day of _____, 2026.

Kerry Lutz
Founder & Managing Director
National Association of American Defrauded Parkers (NAADP)

# Exhibit P

## Exhibit P — Letter to the Secretary of Transportation

Kerry Lutz, Esq.
Director
National Association of American Defrauded Parkers
Palm Beach Gardens, FL 33418


_____, 2026


The Honorable Sean P. Duffy
Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590


**Re: Parking Enforcement, MUTCD Uniformity, and the Erosion of Due Process on America's Streets**

Dear Secretary Duffy,

I write to you as a Florida resident, systems analyst, and author of America's Great Parking Scam: You've Been Robbed!?—and as someone who has spent the past year documenting a nationwide breakdown in on-street parking regulation that directly implicates the Department of Transportation's core mission: uniformity, safety, and public trust on our roadways.

Your early leadership at the Department—particularly your focus on operational accountability, modernization, and correcting long-ignored infrastructure failures—signals a welcome departure from bureaucratic drift. Parking enforcement is one such failure. It has quietly metastasized into a revenue-driven, vendor-captured subsystem operating outside the spirit—and often the letter—of federal traffic control standards.

Across municipalities nationwide, parking enforcement now relies on signage that fails MUTCD requirements for regulatory Traffic Control Devices, substitutes commercial app instructions for lawful regulation, uses non-standard colors and symbols, and requires smartphone access and private contractual acceptance as a condition of compliance. What drivers encounter is no longer regulation—it is coercive instruction, backed by fines, towing, and booting, but untethered from uniform federal standards.

If a regulatory rule cannot be understood without a smartphone, an app account, and acceptance of private contractual terms, it is no longer a Traffic Control Device. It is a paywall masquerading as law. The MUTCD exists to prevent exactly this outcome. Yet parking signage has become a loophole industry—one where municipalities and vendors alike behave as though compliance is optional or unenforced. The result is widespread non-uniform signage,

67

enforcement without clear legal authority, growing due-process exposure for cities, and erosion of public trust.

This problem does not require new legislation. It requires clarity and enforcement. Specifically, DOT could reaffirm that parking regulations are regulatory traffic controls subject to MUTCD standards; clarify that payment instructions, apps, QR codes, and commercial branding are not Traffic Control Devices; require documented engineering judgment for parking sign approval; and issue guidance that non-compliant signage is unenforceable.

Parking enforcement is the most frequent and personal interaction many Americans have with transportation authority. When that interaction feels arbitrary or predatory, the legitimacy of the entire system suffers. Uniformity is not a technicality—it is the foundation of voluntary compliance.

Referenced exhibits are identified below and are available upon notice. In addition, a complete printed copy of **America's Great Parking Scam: You've Been Robbed!?**—containing photographic evidence, statutory analysis, and public-record documentation—is enclosed for reference.

I would welcome the opportunity to provide full documentation and analysis. This is a discrete, solvable problem where decisive leadership would have an immediate nationwide impact.

Sincerely,


Kerry Lutz
Palm Beach Gardens, Florida

# Exhibit Q

## EXHIBIT Q — ParkMobile Privacy Policy, Terms of Use, and Consent Framework (No Age Gating / No Parental Consent Requirement for Minors)

From ParkMobile's website found here: https://parkmobile.io/legal/privacy-policy?utm_source=chatgpt.com

### I. Lack of Age Verification and Parental Consent

ParkMobile's Privacy Policy and Terms of Use contain **no effective age-gating mechanism**, identity verification system, or parental authorization process designed to restrict or regulate use by minors.

Specifically:

- ParkMobile does not require users to verify age prior to account creation.
- ParkMobile does not require parental consent for minors.
- ParkMobile does not implement technical controls preventing underage registration.
- ParkMobile does not require guardianship confirmation for payment authorization.

As a result, minors are permitted to:

- Create accounts,
- Submit personal data,
- Link payment methods,
- Consent to binding arbitration,
- Agree to data-sharing practices,

without meaningful parental involvement or supervision.

### II. Consent to Binding Arbitration and Waiver of Rights

Under ParkMobile's Terms of Use, users agree that:

- All disputes are subject to binding arbitration,
- Jury trials are waived,
- Class actions are prohibited.

This consent is obtained through "browse-wrap" and "click-wrap" mechanisms without individualized acknowledgment, and without safeguards for minors.

No parental assent is required for minors to waive constitutional and statutory rights.

70

## III. Consent to Data Collection and Sharing

ParkMobile's Privacy Policy authorizes the collection and processing of:

- Personal identifiers,
- Location data,
- Vehicle information,
- Payment data,
- Device identifiers,
- Usage metadata.

Users automatically consent to these practices through continued use.

The policy permits sharing of this data with:

- Payment processors,
- Cloud and analytics vendors,
- Municipal partners,
- Parking enforcement contractors,
- Advertising and marketing partners,
- Law enforcement and government agencies.

No additional consent mechanism exists for minors or guardians.

## IV. Disclosure to Third Parties

ParkMobile reserves the right to disclose user data to:

1. Service providers and vendors,
2. Municipal and parking authority partners,
3. Enforcement contractors,
4. Legal authorities,
5. Corporate affiliates,
6. Successor entities in mergers or acquisitions.

The Privacy Policy does not require:

- Minor-specific consent,
- Guardian notification,
- Opt-in authorization for sensitive data.

## V. Notice and Policy Modification Procedures

ParkMobile's policies state that:

- Policy changes may be implemented by website posting,

71

- Continued use constitutes acceptance,
- Individual notice is not required,
- No affirmative re-consent is required.

Minors therefore become bound by revised legal terms without notice to parents or guardians.

## VI. Regulatory and Consumer Protection Implications

By failing to implement age-verification or parental-consent safeguards, ParkMobile permits minors to:

- Enter binding legal agreements,
- Waive procedural rights,
- Transmit financial and location data,
- Authorize third-party sharing,

without meaningful legal capacity or supervision.

This structure exposes minors to:

- Financial risk,
- Data exploitation,
- Surveillance,
- Contractual waiver of rights,
- Enforcement actions based on app activity.

## VII. Summary

ParkMobile's published policies demonstrate:

1. No age-verification system,
2. No parental consent requirement,
3. No minor-specific protections,
4. Automatic consent to arbitration,
5. Broad data-sharing authorization,
6. Passive acceptance of policy changes.

Accordingly, ParkMobile operates a digital payment and enforcement platform that binds minors to complex legal and data-sharing agreements without legally adequate safeguards.

# Exhibit R

## EXHIBIT R — Excerpts from ParkMobile Terms of Service — Contract Formation and Adhesive Consent Framework

Found at ParkMobile's web: https://parkmobile.io/legal/privacy-policy?utm_source=chatgpt.com

### I. Contract Formation Through Use of Service

ParkMobile's Terms of Service state that access to and use of the ParkMobile application constitutes acceptance of its contractual terms.

Specifically, ParkMobile provides that:

- By creating an account, downloading the application, or using the service, users agree to be bound by the Terms of Service.
- Continued use constitutes ongoing acceptance of all terms and future modifications.
- No physical signature, individualized negotiation, or affirmative assent is required.

This structure creates a unilateral, non-negotiable contract imposed as a condition of access to public parking services.

### II. Browse-Wrap and Click-Wrap Acceptance Mechanisms

ParkMobile relies primarily on "browse-wrap" and "click-wrap" methods of consent, including:

- Acceptance through account registration,
- Acceptance through app installation,
- Acceptance through payment submission,
- Acceptance through continued use.

Users are not required to:

- Read the full Terms of Service,
- Scroll through contractual provisions,
- Acknowledge specific waivers,
- Separately approve arbitration or data-sharing clauses.

Consent is presumed through routine consumer conduct.

### III. Adhesion Contract Characteristics

The ParkMobile Terms of Service constitute a classic contract of adhesion, characterized by:

1. Standardized, pre-drafted terms,
2. No opportunity for negotiation,

74

3. Mandatory acceptance to obtain service,
4. Essential-service dependency (public parking access),
5. Disproportionate bargaining power.

Consumers cannot park in many municipalities without accepting these terms, creating economic and practical coercion.

## IV. Binding Arbitration and Waiver Provisions

The Terms of Service impose mandatory arbitration and waiver provisions, including:

- Waiver of jury trial rights,
- Prohibition on class actions,
- Requirement to arbitrate disputes individually,
- Designation of arbitral forum and governing rules.

These waivers are embedded within lengthy terms and are not presented through separate, conspicuous consent mechanisms.

Users are bound without individualized acknowledgment.

## V. Incorporation by Reference

ParkMobile's Terms incorporate additional policies by reference, including:

- Privacy Policy,
- Payment policies,
- Usage guidelines,
- Third-party partner terms.

Acceptance of the Terms automatically binds users to all incorporated documents, including future revisions, without direct notice or renegotiation.

## VI. Unilateral Modification Authority

ParkMobile reserves the right to:

- Amend terms at any time,
- Modify dispute resolution procedures,
- Expand data-sharing permissions,
- Alter fee structures.

Modifications become effective upon posting, and continued use constitutes acceptance.

No affirmative re-consent is required.

## VII. Capacity and Competency Issues

The Terms of Service do not require:

- Verification of legal capacity,
- Confirmation of majority age,
- Guardian authorization,
- Review of contractual competence.

As a result, minors and legally incapacitated persons may be bound to complex contractual obligations without valid capacity to contract.

## VIII. Public Function and Private Contract Overlay

ParkMobile operates as a private intermediary for municipal parking enforcement and payment systems.

Despite performing quasi-public functions, ParkMobile:

- Imposes private contractual restrictions,
- Limits judicial access,
- Controls dispute resolution forums,
- Conditions access to public infrastructure on private terms.

This creates a hybrid regulatory structure lacking traditional public-law safeguards.

## IX. Legal Consequences

Through its Terms of Service, ParkMobile:

- Converts routine parking into a binding commercial contract,
- Imposes procedural waivers,
- Restricts statutory remedies,
- Centralizes dispute control,
- Limits collective redress.

Users are bound without meaningful choice or bargaining.

## X. Summary

ParkMobile's Terms of Service establish:

1. Contract formation by passive use,
2. Adhesive acceptance mechanisms,
3. Mandatory arbitration,

77

4. Unilateral modification rights,
5. Incorporation by reference,
6. No capacity verification,
7. Restriction of judicial remedies.

Accordingly, ParkMobile imposes binding private-law obligations as a condition of accessing public parking infrastructure.

77